UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

| | | | |
|---|---|---|---|
| In re: | : | CHAPTER | 7 |
| | : | | |
| ANTHONY J. SILVESTRI, | : | CASE No. | 16-20640 (JJT) |
| DEBTOR. | : | | |
| | : | | |
| JOHN COUTO and JANE COUTO, | : | ADV. PRO. No. | 16-02056 (JJT) |
| PLAINTIFFS | : | | |
| v. | : | | |
| | : | RE: ECF Nos. | 25, 28 |
| ANTHONY J. SILVESTRI, | : | | |
| DEFENDANT. | : | | |

**RULING AND MEMORANDUM OF DECISION
<u>ON MOTIONS FOR SUMMARY JUDGMENT</u>**

Before the Court are Anthony J. Silvestri's ("Silvestri" or "Defendant") motion for summary judgment (ECF No. 25, the "Defendant's Motion") and John and Jane Couto's (the "Coutos" or "Plaintiffs") cross motion for summary judgment (ECF No. 28, the "Plaintiffs' Motion").

For the reasons set forth below, the Court will deny Defendant's Motion and grant Plaintiffs' Motion in part.

*Factual Background [1]*

In 2006, the Coutos were interested in obtaining a different house from the one in which they were living in North Stonington, Connecticut. The Coutos came upon an upscale five-lot

---

[1] Nearly every fact cited herein was found by the Superior Court for the State of Connecticut, Judicial District of New London in its October 26, 2011 Memorandum of Decision (the "Superior Court Decision") with regard to the matters of *Joseph General Contractors, Inc. v. John Couto and Jane Couto*, Docket No. KNL-CV07-5003779-S, and *John Couto and Jane Couto v. Landel Realty, LLC and Anthony J. Silvestri*, Docket No. KNL-CV-09-5010520.

subdivision in Stonington, Connecticut, called Admiral's Cove.[2] While at first interested in the model house which had been fully built, the Coutos desired a separate dwelling for their special needs daughter on the same lot where they were to have their house located.[3] This was the situation that the Coutos had been able to arrange in North Stonington with cooperation and appropriate rulings from that Town's land-use authorities, and they had no reason to think that the situation in Stonington would be any different.[4]

Silvestri and the Coutos came to an agreement in July 2006, culminating in an agreement signed in July 2006, in which the Coutos and Joseph General Contractors, Inc. ("Joseph General") agreed to purchase and build, respectively, a home and carriage house on Lot 5 in the Admiral's Cove subdivision for a total price of $1,980,000.[5] At the time of the agreement, the Coutos were assured by Silvestri that if they didn't like the finished product they didn't have to buy it.[6]

The specifications were vague, but the overarching crux of the agreement was that the new construction was to be of like kind and quality with the same materials as existed in the model home previously constructed by Silvestri and his companies, Joseph General and Landel Realty, LLC ("Landel").[7] At the time the agreement was entered into, the Defendant was well aware that the Plaintiffs wanted and needed a separate dwelling for their special needs daughter, and assured the Plaintiffs that this requirement would be met.[8]

The first problem arose when Silvestri was unable to obtain financing for the project from Chelsea Groton Savings Bank, because the bank felt that they had already loaned him as much as

---

[2] Superior Court Decision at 2.
[3] *Id.*
[4] *Ibid.*
[5] *Ibid.*
[6] *Ibid.*
[7] *Ibid.*
[8] *Ibid.*

they thought prudent from the standpoint of the bank's exposure.[9] Upon learning that he could not obtain financing, Silvestri told the Coutos that the financing was unavailable because the Coutos had "reserved" the money by obtaining a loan commitment to purchase the property when it was built.[10] This statement was false, and Silvestri knew it was false when he made it.[11] Silvestri indicated that it was the Coutos' fault that he could not obtain financing and that they were likely to forfeit their deposits under the July 2006 contract.[12]

Under this pressure, the Plaintiffs acceded to the Defendant's demands and agreed to purchase the lot from Landel, one of the Defendant's companies, which held title to Lot 5, and to have Joseph General, another of the Defendant's companies, construct the two houses on Lot 5.[13] This agreement, although drafted for signature by Joseph General and the Coutos, was never signed by anyone.[14] The Coutos paid $880,000 for Lot 5 (for which Silvestri, through Landel, had paid $185,000) and obtained a construction loan from Chelsea Groton Savings Bank.[15]

Silvestri, Joseph General and Landel (which paid a considerable amount of the bills incurred for the construction on Lot 5) proceeded to construct the two dwellings on Lot 5 now owned by the Coutos.[16] Silvestri's promise that if the Coutos didn't like the finished product they didn't have to purchase it was rendered illusory by Silvestri's pressuring the Coutos to obtain the construction financing themselves when Silvestri was unable to perform his part of the bargain contained in the only signed contract entered into by any of the parties.[17] The Coutos were

---

[9] *Ibid.*
[10] *Id.* at 3.
[11] *Id*. at 3, 7.
[12] *Id*. at 3.
[13] *Id.*
[14] *Ibid*.
[15] *Ibid.*
[16] *Ibid*.
[17] *Ibid.*

extremely inexperienced and unsophisticated in the area of home construction, while Silvestri was an experienced homebuilder and land developer.[18]

Silvestri apparently thought that zoning requirements restricting lots in Admiral's Cove could be circumvented by not installing a stove in the smaller dwelling unit after certificates of occupancy were obtained, an optimistic conclusion drawn from a settled piece of litigation (with other parties) involving the Town of Stonington which had been resolved by removing a stove from a garage apartment.[19] Unfortunately, the Zoning Enforcement Officer of the Town had not concurred in that settlement (by the Town's Zoning Board of Appeals) and enforced the plain meaning of the one dwelling limitation.[20] If the single dwelling restriction on Lot 5 was mentioned at all by Silvestri, it was mentioned in the context that it would not be a problem as long as a stove was not connected.[21]

Silvestri and the Coutos had also agreed that the houses were to be designed by the same architect who designed the model house.[22] As the project began the design phase, Silvestri advised the Coutos that that architect was busy and substituted a designer who Silvestri claimed had a higher certification than an architect.[23]

Silvestri discovered that the design produced was larger than the 4000 square feet +/- provided in the unsigned contract, and so the designer was later instructed to reduce its size.[24] Subsequent designs were indeed smaller, but as construction progressed, it became painfully

---

[18] *Id.* at 3-4.
[19] *Id.* at 4.
[20] *Ibid.*
[21] *Ibid.*
[22] *Ibid.*
[23] *Ibid.*
[24] *Ibid.*

obvious that many rooms were not going to be functional, i.e., toilets placed so as to be unusable, kitchen dimensions which rendered sinks unusable, and so on.[25]

It soon also became apparent that the house was not designed in a manner similar to the model house upon which the agreements of the parties was based.[26] The Coutos were unable to find fixtures within the allowances set forth in the unsigned contracts. The selection process for fixtures, finishes and the like was proceeding apace.[27]

At the same time, Silvestri attempted to get another large progress payment, but the Coutos were reluctant to pay more money until allowance issues had been resolved. The Coutos' position was reasonable, particularly in view of the fact that Silvestri and his companies, Joseph General and Landel, had been completely paid-to-date for work performed.[28]

When the demanded payment was not forthcoming, Silvestri walked off the job along with his companies, leaving the Plaintiffs, who by now had sold their North Stonington home and were living in a hotel, in dire straits.[29] Silvestri subsequently caused a mechanics lien to be placed on Lot 5, and willfully prevented the Coutos from accessing the sewer line by welding it shut, requiring the Coutos to obtain relief by suing to prevent Silvestri from continuing to block their access to the sewer line "to which they were so clearly entitled."[30]

As the Coutos were completing the construction of the dwellings, it was discovered that considerable quantities of construction debris had been dumped and buried where the smaller house was to have been built.[31] Silvestri had dumped this debris on the Plaintiffs' Property.[32]

---

[25] *Ibid.*
[26] *Ibid.*
[27] *Id.* at 5.
[28] *Id.*
[29] *Ibid.*
[30] *Ibid.*
[31] *Ibid.*
[32] *Id.* at 5, 7.

As a consequence, the Coutos brought suit against Silvestri for, *inter alia*, common law fraud, trespass, violation of the Connecticut Unfair Trade Practices Act ("CUPTA") and breach of contract in the Superior Court for the State of Connecticut, Judicial District of New London (the "Superior Court"). On October 26, 2011, following a trial on the merits, the Superior Court entered its Memorandum of Decision, which held, *inter alia*, that Silvestri's actions violated CUPTA.[33] In support of its determination in favor of the Coutos on their CUPTA claim, the Superior Court expressly found that Silvestri's actions were unscrupulous, oppressive, unfair and deceptive, including blaming the Coutos for his inability to obtain the financing necessary to fulfill his companies' contractual obligations, pressuring the Coutos into a changed arrangement for the house construction, the blatant attempt to force payment(s) that were not owed by welding the access cover to the unconnected sewer closed and the dumping of debris on the Coutos' property.[34]

The Superior Court also determined that Silvestri committed the tort of trespass.[35] However, on the Coutos' fraud claim, the Superior Court ruled in favor of Silvestri, finding that the Coutos' failed to meet their burden of proof with clear and convincing evidence.[36]

The Appellate Court for the State of Connecticut affirmed the Superior Court Decison *sub nom. Joseph General Contracting, Inc. v. Couto and Couto v. Landel Realty, LLC*, Docket Nos. AC 34100 and AC 34102, which ruling is reported at 144 Conn. App. 241 (2013). The Supreme Court for the State of Connecticut affirmed the Appellate Court's ruling *sub nom. Joseph General Contracting, Inc. v. Couto and Couto v. Landel Realty, LLC*, which ruling is reported at 317 Conn. 565 (2015).

---

[33] *Id.* at 7.
[34] *Id.*
[35] *Ibid.*
[36] *Ibid.*

On November 20, 2015, the Superior Court entered an order clarifying its assessment of damages against the Defendant, and found that the Defendant was liable to the Plaintiffs in the amount of $573,658.85, plus attorneys' fees in the amount of $125,000.00 for the Defendant's violations of CUPTA, and $20,436.30 for trespass.[37] Silvestri did not appeal the Superior Court's order clarifying the award of damages.[38]

As found by the Superior Court and affirmed on appeal by Supreme Court for the State of Connecticut, Silvestri, either personally or through the companies that he controlled, was responsible for welding the Coutos' access cover to the unconnected sewer closed, and dumping debris on their property in a "blatant attempt to force money [from the Coutos] that was not owed".[39]

On April 22, 2016, Silvestri filed a voluntary petition under Chapter 7 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Connecticut. Following the Defendant's filing for Chapter 7 relief, the Coutos brought the instant adversary proceeding (the "Adversary Complaint"), seeking to except from Silvestri's discharge, his debt to the Plaintiffs pursuant 11 U.S.C. §§ 523(a)(2)(A) and (a)(6). Specifically, the Coutos assert in their Adversary Complaint that Silvestri's conduct, as determined by the Superior Court, and Appellate Courts affirming the Decision, constitutes actual fraud under Section 523(a)(2)(A) (Count I), fraudulent misrepresentation also under Section 523(a)(2)(A) (Count II), and that Silvestri's trespasses constitute willful and malicious injuries to the Plaintiffs or their property, within the meaning of Section 523(a)(6) (Count III).

---

[37] *Id*. at 8; November 20, 2015 Superior Court Damages Order.
[38] ECF No. 26, October 4, 2016 Pretrial Conference at 15:2-17:2.
[39] Superior Court Decision at 5, 7; *Couto*, 317 Conn. at 593; May, 20, 2011 Cross-Examination of Anthony Silvestri before the Honorable Joseph Q. Koletsky at 41:13-41:18.

On October 31, 2016, Silvestri moved for summary judgment on all three counts of the Adversary Complaint. On November 28, 2016, the Coutos filed a cross motion for summary judgment on Count I and Count III of their Adversary Complaint. The Court held oral argument on both motions on July 11, 2017, thereafter taking these motions under advisement.

*Standard of Review*

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (made applicable in bankruptcy proceedings by Fed. R. Bankr. P. 7056). The burden rests with the moving party to clearly establish the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53 (1986); *Adickes v. S.H. Dress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

*Discussion*

A.  <u>Defendant's Motion Lacks Merit</u>

Silvestri asserts that he is entitled to judgment as a matter of law on all three counts asserted in Plaintiffs' Adversary Complaint. The Court disagrees.

With regard to Count I, Silvestri asserts that the Coutos' claim for actual fraud is barred by the doctrine of *res judicata* because the Superior Court ruled against the Coutos on their common law fraud count. Silvestri is incorrect. To be sure, "[w]here the debt in question is a judgment entered after a claim of fraud has been adjudicated, either party to a subsequent adversary proceeding on nondischargeability can invoke collateral estoppel to establish that the debt is or is not dischargeable under the relevant nondischargeability provision." *In re DeTrano*, 326 F.3d 319, 322 (2d Cir. 2003) (citing *Grogan v. Garner*, 498 U.S. 279, 285–91, 111 S.Ct.

654, 112 L.Ed.2d 755 (1991)). However, where, as here, Plaintiffs must meet a lower burden of proof in subsequent litigation – *i.e.*, preponderance of the evidence under Section 523[40] in this action versus the clear and convincing standard on their state law fraud claim – courts will not give preclusive effect to a prior judgment in favor of a defendant. *See Matosantos Commercial Corp. v. Applebee's Int'l, Inc.*, 245 F.3d 1203, 1212 (10th Cir. 2001); Restatement (Second) Judgments, § 28(4) (1982); *Rawling v. City of New Haven*, 206 Conn. 100, 111, n.7 (1988); *Williams v. Comm'r of Correction*, 100 Conn. App. 94, 106 (2007).

For the same reason, Silvestri's reliance on the doctrine of *res judicata* with regard to Count II is unavailing.

With regard to Count III, the Coutos' claim under Section 523(a)(6), Silvestri argues that his welding shut of the sewer access to Coutos' property in an attempt to extract a payment that was not owed cannot support a finding of willful and malicious injury. This assertion is utterly without merit. For the reasons set forth below, the Court will grant the Plaintiffs' Motion on Count III.

Accordingly, the Defendant's Motion is denied in its entirety.

B. <u>The Court Will Grant Plaintiffs' Motion In Part</u>

The Coutos seek summary judgment on both Count I (actual fraud) and Count III (willful and malicious injury).

Subsections (a)(2)(A) and (a)(6) of Section 523 provide, in pertinent part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

   (2) for money property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

---

[40] *Cooke v. Cooke (In re Cooke)*, 335 B.R. 269, 275 (Bankr. D. Conn. 2005) ("[T]he plaintiff bears the burden of proving those elements by a fair preponderance of the evidence [under 11 U.S.C. § 523(a)(2)(A)].").

>   (A) false pretenses, a false representation, or ***actual fraud***, other than a statement respecting the debtor's … financial condition[.]
>
>   (6) for ***willful and malicious injury*** by the debtor to another entity or to the property of another entity;

11 U.S.C. §§ 523(a)(2)(A), (a)(6) (emphasis added).

As explained below, the Coutos are not entitled to summary judgment on Count I. However, summary judgment shall enter in favor of the Coutos on Count III.

1. Count I (Actual Fraud)—Bankruptcy Code Section 523(a)(2)(A)

'Actual fraud' is one of three distinct grounds for non-dischargeability of a debt under Section 523(a)(2)(A). *See Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1590, 194 L. Ed. 2d 655 (2016). In *Husky*, the Supreme Court "broadened the definition of actual fraud to include types of frauds beyond frauds based on a misrepresentation." *Argento v. Cahill (In re Cahill)*, No. 15-72418-REG, 2017 WL 713565, at *6 (Bankr. E.D.N.Y. Feb. 22, 2017) (citing *Husky*, 136 S.Ct. at 1586). Without delimiting the scope of conduct that may be considered 'fraud', the Supreme Court defined 'actual fraud' as "anything that counts as 'fraud' and is done with wrongful intent," including the fraudulent conveyance scheme perpetrated by the debtor in *Husky*. *Id.*

While the *Husky* decision clarified that 'actual fraud' need not include a false representation, "the Supreme Court clearly held that 'actual fraud' also encompasses fraudulent inducement based on a representation." *Id.* at *7. When actual fraud is perpetrated through a misrepresentation, "[t]he elements of actual fraud under [the] Bankruptcy Code incorporate the general common law of torts and likewise include a false representation, scienter, reliance, and harm." *Evans v. Ottimo*, 469 F.3d 278, 283 (2d Cir. 2006). The *Husky* decision did nothing to alter these foundational requirements. *Cahill*, 2017 WL 713565, at *7; *In re Korn*, 567 B.R. 280,

304-05 (Bankr. E.D. Mich. 2017). Indeed, in *Husky*, the Supreme Court recognized that it "has historically construed the terms in § 523(a)(2)(A) to contain the 'elements that the common law has defined them to include'" and confirmed that certain requirements—such as reliance by a creditor—must be met when a fraud is effected through a misrepresentation made to a creditor. *Husky*, 136 S.Ct. at 1586, 1589 (*quoting Field v. Mans*, 516 U.S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)).

Here, the Coutos contend that the following facts upon which the Superior Court held Silvestri liable for a violation of CUPTA suffice to establish 'actual fraud' under Section 523(a)(2)(A):

> a. the Defendant's blaming the Plaintiffs for his inability to obtain the financing necessary to fulfill his companies' contractual obligations;
> b. the Defendant's pressuring the Plaintiffs into a changed arrangement for the house construction;
> c. the Defendant's blatant attempt to force money that was not owed by welding the access cover to the unconnected sewer closed; and
> d. the Defendant's dumping debris on the Plaintiffs' property.

ECF No. 31, Plaintiffs Memorandum of Law in Support of Their Cross-Motion for Summary Judgment and in Opposition to the Defendant's Motion for Summary Judgment at 19; Superior Court Decision at 7. To the extent that these actions may be regarded as deceptive, they clearly involve fraudulent inducement based on misrepresentation. However, the Coutos do not sufficiently satisfy their burden in this Motion to establish the existence of a "false representation, scienter, reliance, and harm", *Evans*, 469 F.3d at 283, by stringing together a series of deceptive conduct and intentional wrongs.

Accordingly, Plaintiffs' Motion is denied with respect to Count II.

2. Willful and Malicious Injury

"The word 'willful' in [11 U.S.C. § 523](a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S. Ct. 974, 977, 140 L. Ed. 2d 90 (1998). Therefore, this provision "contemplates injury analogous to an intentional tort." *Orr v. Marcella* (*In re Marcella*), 463 B.R. 212, 219 (Bankr. D. Conn. 2011); *Navistar Fin. Corp. v. Stelluti* (*In re Stelluti*), 94 F.3d 84, 87 (2d Cir. 1996). "The term 'malicious' means wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Id.*

Here, the Superior Court found that Silvestri welded the sewer access shut to extract a payment from the Coutos that was not owed. Clearly, therefore, Silvestri intended to inflict the injury that inevitably flowed from his actions. Moreover, this intentional injury was both wrongful and without just cause or excuse, as it deprived the Coutos of access to their sewer line "to which they were so clearly entitled." Superior Court Decision at 5.

Accordingly, Plaintiffs' Motion is granted with respect to Count III. A separate judgment on that Count will issue herewith.

IT IS SO ORDERED at Hartford, Connecticut this 6th day of February 2018.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut